IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA   :  Case No.  23-CR-521-003
             :
    v.        :
             :
SYHEED GOODMAN,     :
    Defendant    :

## DEFENDANT'S SENTENCING MEMORANDUM

THE CRIME

For two years between 2021 through 2023, Syheed Goodman, along with his two childhood friends, co-defendants Tariq Bennett and Michael Colbert, developed and ran a scheme involving renting or purchasing tractors, backhoes, and cars from dealerships and home improvement stores.  Using fabricated driver licenses, one or more of them would go into a store or dealership and rent or purchase the vehicles/equipment and thereafter would fail to return rentals or fail to make payments on purchased vehicles/equipment.  Some of those vehicles crossed state lines and many were not recovered.  Some of them were shipped abroad illegally by a different network of individuals.

Syheed Goodman's role was largely to create the driver licenses with a photo of one of the three of them in combination with utilizing stolen identity information of a third party victim.  Most frequently co-defendant Bennett appeared in the stores and rental agencies to complete the actual rental and purchase transactions, and occasionally Mr. Goodman accompanied Bennett

inside.  The three young men would then arrange to sell the vehicles and equipment, many times for a fraction of their true value, and shared equally in the proceeds.

PROCEDURAL HISTORY INVOLVING DEFENDANT GOODMAN

Initially, co-defendants Bennett and Colbert were indicted in December 2023.  However, in June 2024, a grand jury returned a Superseding Indictment that was broader in scope, charging Conspiracy and additional substantive offenses, and also incorporating Mr. Goodman into the Indictment.  Mr. Goodman is accused of Conspiracy, Aggravated identity theft, Fraud in connection with identification documents, and Transportation of stolen vehicles.

On November 13, 2025 Mr. Goodman entered a guilty plea before this Court to the following counts from the Superseding Indictment:  Count 1—Conspiracy under 18 U.S.C. § 371, Counts 2-17—Wire fraud under 18 U.S.C. § 1343, Count 18 and Counts 21-23—Aggravated identity theft under 18 U.S.C. § 1028(A)(a)(1), (c)(5), Counts 24-26—Fraud and related activity in connection with identification documents and aiding and abetting under 18 U.S.C. § 1028 and 2, and Counts 27, 29-30—Transportation of stolen motor vehicles under 18 U.S.C. §2312.

Upon issuance of the Superseding Indictment, Mr. Goodman was arrested by FBI on July 2, 2024.  He was released on $10,000 (ten thousand dollars) bail.  On July 18, 2024 with several conditions.   He has remained on pretrial release for the duration of the case.

Important terms of the plea agreement included the following:

1)  The Government may recommend a sentence of imprisonment at the bottom of the applicable guideline range, and recommend that the required two-year mandatory

minimum sentence for three of the counts of Aggravated identity be run concurrently to the fourth count of Aggravated identity theft, and make whatever sentencing recommendations it deems appropriate pertaining to forfeiture, restitution or other matters.

2) The defendant agreed to pay restitution in the amount of $1,527,355.47, and any fine imposed by the Court.

3) The defendant would pay the special victim/witness assessment of $2,700 as directed by the Court.

4) Pursuant to USSG §6B1.4, the parties have the following stipulations with the understanding that they are free to argue (except as below) the applicability of any other provision of the Sentencing Guidelines, that these stipulations are not binding on the Probation office or the Court, and that the Court may make factual and legal determinations that differ from these stipulations and may result in an increase or decrease in the Guidelines range and sentence that may be imposed:

a) Under USSG § 2B1.1, the base offense level for Defendant is 7 and is then increased by 16 levels based upon the actual fraud loss of $1,527,355.47 of the conspiracy.[1]

b) The offenses involved 10 or more victims, increasing the offense level by 2 levels.

c) There is a 2-level increase because the offenses involved an organized scheme to steal or receive stolen vehicles.

---

[1] The plea agreement terms anticipated an upward adjustment of 16 levels, pursuant to USSG §1B1.3. However, the PSR officer determined that the loss amount is $938,096.75 and that the upward adjustment for the actual fraud loss is 14 levels.

    d)  There is a 2-level increase because the offenses involved possession of 5 or more means of identification that unlawfully were produced from or obtained by the use of another means of identification.

    e)  As of the date of the plea agreement, Defendant had demonstrated acceptance of responsibility to earn a 2-level downward adjustment.

    f)  As of the date of the plea agreement, Defendant's acceptance of responsibility was timely, thereby earning an additional 1-level downward adjustment.

5. The defendant agreed to waive all rights under 18 U.S.C. §3742.

6. Defendant agreed to forfeit all rights, title and interest in all assets which are the subject of forfeiture as contained in the plea agreement.

GUIDELINE CALCULATIONS

There is a mandatory minimum applicable to the four counts of Aggravated identity theft here, with a requirement that any other sentence imposed for the remaining counts be run consecutively to the sentence for Aggravated identity theft, but the Aggravated identity theft counts may be run consecutively or concurrently to each other. Defendant has been released on bond since just after the inception of the case. He has approximately six days of custody time credit.

Defendant and counsel have thoroughly reviewed the Presentence report [hereinafter "PSR"] in this case and have no objections to the final PSR, including the Guideline calculations presented in the PSR. Based upon the total offense level of 22, and a criminal history category of I, the applicable guideline range would be 41-51 months; however, as noted in the PSR, since there is a requirement that at least one mandatory minimum of two years for Aggravated identity

theft must be imposed consecutively to any other sentence, the Guidelines must incorporate that possibility.  As noted in footnote 23 of the PSR, if the Court were to impose one 24-month mandatory minimum sentence, and run the remaining three counts concurrently to the first, the bottom range becomes 65 months, but if all four Aggravated identity theft counts run consecutively to each other, then the upper end of the Guideline range becomes 147 months.

The Sentencing Commission has eliminated Guideline departures as a phase of the sentencing process—with two exceptions that are not applicable here.

SENTENCING ARGUMENTS

The starting guidelines here would have been 41-51 months, but due to the Aggravated identify theft counts, the effective Guidelines here are 65-147 months.  The Court therefore has a very broad guideline range to work with.  If the Court were to impose one 24-month sentence for one Count of Aggravated identity theft, and run the remaining like counts concurrently to the first, and then impose a sentence at the bottom of the Guidelines for the remaining counts but consecutively to the Aggravate identity theft, that would result in a total sentence of 65 months.  In theory, the Court could impose 24 months for one count of Aggravated identity theft, with the remaining like counts running concurrently, and one additional day for all other remaining counts, to run consecutively.  Of course, that would be a sentence well below the Guidelines.  But, the Court is faced with not only consideration to the Guidelines, but whether a sentence below the Guideline range is appropriate, and what kind of variance may be warranted.  To that end, the defense points out that U.S. v. Booker, 125 S.Ct. 738 (2005) has rendered the federal sentencing Guidelines "effectively advisory." 125 S.Ct. at 757.  The Supreme Court has made clear in Rita v. United States, 127 S.Ct. 2456 (2007), Kimbrough v. United States, 128 S.Ct. 558

(2007), and <u>Gall v. United States</u>, 128 S.Ct. 586 (2007) that section 3553(a) is the controlling sentencing law and rejects the methods used after <u>Booker</u> to maintain any *de facto* mandatory guideline system.  The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence."  <u>Gall</u>, 128 S.Ct. at 602.  The <u>Gall</u> and <u>Kimbrough</u> decisions expressly rejected mindless uniformity to the Guidelines.  Further, it is no longer permissible for reviewing courts to apply percentage or mathematical calculations based on the distance from the Guideline range, or to require "extraordinary" circumstances to justify departures or variances.  <u>Gall</u>, 128 S.Ct. at 595.

Instead, this sentencing court is required to consider the Guideline ranges, but is permitted to tailor a sentence in light of other statutory factors.  The factors that must be considered are:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed;

(3)  the kinds of sentences available;

(4)  the guidelines and policy statements issued by the Sentencing Commission, including the guideline range;

(5)  the need to avoid unwarranted sentencing disparity; and

(6)  the need to provide restitution where applicable.

18 U.S.C. §3553(a)(1-6).

Neither the statute nor <u>Booker</u> suggests that any one of these factors is to be given greater weight than any others.  However, all factors are subservient to section 3553(a)'s mandate to impose a sentence not greater than necessary to comply with the four purposes of sentencing.

With those guiding principles, the defense believes and avers that a significant variance is warranted in this case for the following reasons:

1) Shortly after his arrest on the Superseding Indictment on July 2, 2024, Defendant was released on $10,000 bail, effective July 8, 2024. He has therefore been under Pretrial supervision for 1 ¾ years. He has been compliant with Pretrial Services for all that time, with no problems or concerns raised.

2) Defendant has a Criminal History Category of I with NO criminal history points. He had two prior "contacts" with police. One of them was 15 years ago when he was charged with Reckless endangerment, a second degree misdemeanor, and the case was *nolle prossed*. The other contact was theft/forgery charges in New Jersey, similar to the charges in the within federal case, and which were filed in April 2024, prior to his arrest and Indictment in the within case. Ultimately that New Jersey case put Defendant into a diversionary disposition whereby the case will eventually be dismissed.

3) Defendant is 37 years old, has been in a long-term relationship with his paramour for 16 years, and shares two young children with her. They were living as a family at the time of Defendant's arrest. However, due to the terms of Defendant's Pretrial release, Defendant has been living with his mother since then, but sees his paramour and two children daily.

4) Additionally, Defendant has a very strong family network to support him, including his mother and siblings, and his stepfather who is in the military; none of them has a criminal record.

5) The instant offense is strictly non-violent in nature.

6) Defendant will be held responsible for a large amount of restitution that may take him decades to pay back.  He has various income streams, but for someone in his position, the restitution will be a monstrous financial burden and, arguably, quite punitive on its own.

7) It should be pointed out that the numbers which drive the Guidelines here are based upon total fraud loss—meaning actual loss to victims.  The defense understands that total loss to victims—irrespective of profit—is a correct method for determining loss. But it is still worth pointing out that Defendant in no way received $938,096.75 in his pocket, and not even 1/3 of that amount if divided among the three defendants.  As detailed in the PSR, the vehicles and equipment here were sold into a black market for pennies on the dollar, resulting in total profits to the three defendants of roughly $64,250, which was then split three ways, putting $21,415 into Mr. Goodman's pocket.  Given the risk level to each of them of being discovered, and the relatively large efforts put by them into creating fake identifications, appearing at car dealerships and Home Depots to apply for credit and proceed with rentals and outright sales, along with efforts to elicit buyers in the black market, it would seem that this scheme didn't pay much relative to the work involved.  Understandably, what matters in calculating Guidelines is the actual loss to the dealerships and home improvement stores who no longer have the vehicles and machinery in their possession to make a sale.  But, it is worth contrasting the within scheme to more sophisticated investment and bank schemes where actual dollars are pilfered and the loss suffered to the victim is the same amount of profit that went into the pocket of the accused.  It would seem that because profit to the three defendants was relatively

small as compared with efforts put in to pull off their scheme, the overall scheme had a lesser level of sophistication.

8) Defendant resides with his mother and siblings in his mother's Upper Darby home. He has primarily resided there for the past 25 years.

9) Defendant does not suffer from any physical health problems that interfere with his ability to work and support his family.

10) Defendant does not suffer from any mental health problems that interfere with his ability to work and support his family.

11) Defendant does not suffer from any substance abuse problems requiring treatment; indeed, as noted in the PSR, the death of Defendant's father many years ago from an overdose and witnessing substance use by his father's family in the past has been a major guiding deterrent for Defendant who has chosen to completely abstain from substances. A drug and alcohol evaluation from 2024 and all negative urine tests for Pretrial Services confirm that he has no substance problems.

12) Defendant was an average student at Upper Darby High School and although he was a registered student at Cheney University many years ago, he did not go very far in his college career before withdrawing; however, it becomes apparent to anyone who interacts with him that he is highly intelligent.

13) Defendant has engaged in various sources of employment, both for his mother in her specialty stores serving desserts, and in various capacities related to the arts.  He is a recognized rap artist in the Philadelphia region, and has developed income streams by screen printing, doing music production, social media content, and videography. Defendant will elaborate on this part of his life in the sentencing hearing.

14) Defendant is an excellent candidate for supervision in the community.  No special rehabilitative services, such as mental health, drug treatment or vocational training are warranted; he does understand that as part of any supervised release he will likely be required to maintain and demonstrate documented, stable full-time employment and income.

At the sentencing hearing, the defense intends to present the testimony of Defendant, and some of his friends and family members.  These individuals are best equipped to address his history and characteristics which warrant a variance from the Guideline range.

This Court has only had one interaction thus far with Defendant Goodman  (at his change of plea).  The defense requests that the Court give careful consideration to the arguments herein of counsel, and the testimony presented at sentencing related to Defendant's background.  Additionally, Defendant requests that in fashioning his sentence and for any period of incarceration, that the Court recommend Defendant be designated to a facility that incorporates his love for music and the media arts.  Equally important to Defendant is that he be designated to a facility relatively close to his family in Upper Darby.

The defense believes that the evidence presented at sentencing, along with arguments contained herein will, collectively, give the Court ample reason to vary from the Guideline range and impose a sentence that reflects the seriousness of the offenses while balancing the needs of Defendant and the community.

Respectfully submitted,

s/KER 7292
KATHRYN E. ROBERTS, ESQUIRE
527 Hamilton Street
Allentown, Pa 18101
(484) 695-7023 (PH)
(484) 714-0901 (fax)
KathrynRoberts_Esquire@yahoo.com
www.AllentownCriminalLaw.com
Pa  ID # 82739

## **CERTIFICATE OF SERVICE**

I, Kathryn Roberts, Esquire, counsel for Defendant, hereby certify that I have served by email a copy of the Defendant's Sentencing Memorandum upon Meghan Claiborne Bisio, Esquire, Assistant United States Attorney, Suite 1250, 615 Chestnut Street, Philadelphia, PA 19106-4476 and The Honorable Karen Spencer Marston, 16613 U.S. Courthouse, 601 Market Street, Philadelphia, Pa 19106.

s/KER7292
KATHRYN E. ROBERTS, ESQUIRE

Date:   April 18, 2026